CORAL LEE FORMANACK, APPELLEE, V. THOMAS JOSEPH FORMANACK, APPELLANT.

451 N.W.2d 250

Filed February 2, 1990.   No. 88-268.

James E. Bachman, of Bachman & Blunk, P.C., for appellant.

Donald R. Witt, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

## I. INTRODUCTION

A South Dakota court dissolved the marriage between petitioner mother, Coral Lee Formanack, the appellee in this court, and respondent father, Thomas Joseph Formanack, the appellant in this court, and later awarded custody of the two minor children of the parties to the father without obligating the mother for child support. Following other proceedings, the father brought this action pursuant to the provisions of the Revised Uniform Reciprocal Enforcement of Support Act (RURESA), found at Neb. Rev. Stat. §§ 42-762 et seq. (Reissue 1988), asking the court below to modify the South Dakota decree so as to require the mother to pay child support. The court below dismissed the father's action and awarded the mother an attorney fee. The father's three assignments of error consolidate to assert the court below abused its discretion in (1) failing to order the mother to pay child support and (2) awarding her a $500 attorney fee. We affirm the attorney fee award, but reverse the denial of child support and remand the cause with the direction that the court below order the mother to pay child support in the sum of $10 per month per child.

## II. FACTS

The initial 1980 South Dakota decree granted sole legal and physical custody of the parties' two sons, Marcus William, who was born on May 31, 1971, and Matthew Joseph, who was born on October 18, 1975, to the mother and ordered the father to pay child support for both children in the amount of $550 per month.

Each of the parties later moved to Nebraska; at the time of the hearing below, the father lived in Douglas County and the mother in Lancaster County. Eventually, the father became delinquent in his child support obligation. In an attempt to collect the claimed $8,725 arrearage, the mother registered the South Dakota judgment in the respective district courts for Lancaster and Douglas Counties. In the autumn of 1985, the parties reached a settlement agreement concerning the amount the mother would accept in satisfaction of the child support arrearage.

It appears that in August of 1985, the South Dakota court, in accordance with the stipulation of the parties precipitated by the children's request to live with their father, modified its initial decree by placing physical custody of the children with the father and terminating the father's child support obligation. At that time the father did not request that the mother be required to pay child support.

In December of that same year, the father petitioned the district court for Douglas County, Nebraska, pursuant to the Nebraska Child Custody Jurisdiction Act, Neb. Rev. Stat. §§ 43-1201 et seq. (Reissue 1984 & Cum. Supp. 1986), for full legal custody of the children and reasonable child support from the mother. The court, pursuant to the mother's motion for partial summary judgment on the basis that the court lacked jurisdiction to modify the support portion of the South Dakota decree, struck that portion of the father's petition. However, pursuant to the parties' stipulation, the Douglas County District Court, in January 1987, granted joint legal custody of the children to both parents. No appeal was taken from those orders.

Less than a month later, the father filed this action, alleging the conclusion that there had been "material changes in circumstance" since the entry of the decree of dissolution and the mother's subsequent registration of the child support judgment in her favor which justified a modification of the South Dakota decree so as to require the mother to pay reasonable child support.

At the September 17, 1987, hearing below, the father adduced evidence establishing that until March 1986, he practiced dentistry as an employee of a group of dentists, earning $35,480 in 1985 and $13,970 until March 1986. Under its agreement with the father, the dental group was, at the end of 2 years, required to allow the father "to buy 25 percent of the business," but "it was decided that [he] would not buy in."

After he was unable to secure other employment, the father established his own practice, organizing it as a professional corporation in July 1986. According to him, the practice has lost money since its inception, yielding a gross income for the months of January through August 1987 of $44,965.60, but

generating during those same months expenses of $53,246.28. He did not itemize those expenses and admitted on cross-examination that they included at least six checks he had written himself in the amounts of $700 in April, $400 in May, $900 in June, $1,300 in July, $1,900 in August, and $700 in September. The testimony does not make clear whether these payments constituted loans from the practice to himself or whether the practice was repaying him for a loan he had previously made to the practice. The father expressed the hope that the practice would show a profit in 1988, although it had not done so in 1987.

The father also introduced into evidence a summary of his personal expenses, assets, and debts at the time of "the two . . . modifications of the Decree" and at the time of the hearing. According to the summary, the father's personal expenses at the time of the hearing were approximately the same as they had been when he obtained possession and thereafter joint custody of the children. The summary shows that his debts have increased from several hundred dollars owed to credit card companies and $5,000 owed to the Internal Revenue Service to his current debts consisting of $55,000 owing to Security Pacific, $740 to Contel Credit, $3,070 to Visa, $2,190 to Mastercard, $4,400 to Noddle Development, $1,000 to the Internal Revenue Service, $1,200 to the mother for past alimony, and amounts owing to his family. The debt to Security Pacific relates to moneys he borrowed to establish and operate his practice. The father also borrowed moneys to pay the mother the amount owed her under the settlement agreement reached between them concerning the past child support arrearage. His assets have also increased from household furnishings and "several hundred dollars" in bank accounts to "[a]ssets of $57,931.00" and accounts receivable of $8,000.

According to the father, his average monthly expenses, including rent, food, utilities and telephone, clothing, credit card payments, transportation expenses, insurance, alimony, entertainment, and miscellaneous, amount to $2,110.

The mother is employed with an insurance company as an underwriter correspondent, earning a gross income of $610 every 2 weeks and a net income of $421 every 2 weeks. The

South Dakota decree ordered the father to pay the mother $100 in alimony, but by the time of the hearing below, the father owed the mother $1,200 in alimony. According to the mother, she has $4,000 left from a $30,000 cash settlement she received at the time of the divorce, the rest of the moneys having been spent for the support of the children. Her other assets include furniture worth $500 and an automobile. Her monthly expenses, including rent, gas, electricity, telephone, cable television service, newspaper subscriptions, automobile expenses, groceries, credit card bills, attorney fees, medical bills, life and home insurance, expenses for the children, and miscellaneous, amount to $872.71.

In ruling as stated earlier, the court below concluded that it had jurisdiction under RURESA to order the mother to pay child support but found that the father did not come to court with "the clean hands required" because of his failure to pay alimony and child support during the period of time the mother had custody of the children and his subsequent failure to pay alimony, that he had not been "completely truthful" in representing his current financial condition, and that his earning capacity was "far greater" than the mother's. The court awarded a $500 attorney fee to the mother.

## III. ANALYSIS
### 1. Purpose of and Remedies Under RURESA

The purpose of RURESA is to provide an economical and expedient means of enforcing duties and orders of support for parties located in different states. § 42-762; *Johns v. Johns*, 5 Va. App. 494, 364 S.E.2d 775 (1988). As stated in Annot., 31 A.L.R.4th 347 at 350 (1984):

> Prior to the creation and adoption of the Uniform Reciprocal Enforcement of Support Act . . . the problem of interstate enforcement of duties of support became acute with the increasing mobility of the American population. A deserting spouse was beyond the reach of process in the state where he had abandoned his family, which often had no means to follow him, and welfare departments, saddled with the burden of supporting destitute families, were often prevented from enforcing

the duty of support in the state where the deserting spouse could be found, by decisions holding that the duty existed only as to obligees within the state.

RURESA provides two civil remedies. Under the first, the procedure for which is outlined in the civil enforcement sections contained in part III of the act, the party claiming support, the obligee, may bring suit in the obligee's home state, the initiating state (not necessarily the same state which entered the dissolution decree), and obtain a judgment for support in the state in which the obligor is present, the responding state. 1 H. Clark, The Law of Domestic Relations in the United States § 7.6 (2d ed. 1987); §§ 42-763(f) and 42-768 to 42-795. This part of the act contemplates that the obligee file in the initiating state a petition for support; if the initiating state court determines that the petition "sets forth facts from which it may be determined that the obligor owes a duty of support, and that a court of the responding state may obtain jurisdiction of the obligor or his property," then the initiating state court shall forward the petition to the responding state. § 42-775. Thus, the initiating state court only determines whether further proceedings are warranted. *Pfueller v. Pfueller*, 37 N.J. Super. 106, 117 A.2d 30 (1955). See, also, *Matter of Burke v Adams*, 130 A.D.2d 100, 518 N.Y.S.2d 148 (1987); *Prager v. Smith*, 195 A.2d 257 (D.C. 1963); *State Ex Rel. Lyon v. Lyon*, 75 Nev. 495, 346 P.2d 709 (1959); *State v. Perry*, 198 Tenn. 389, 280 S.W.2d 919 (1955). Upon receipt of the petition, the responding state court notifies the prosecuting attorney, who "shall take all action necessary . . . to enable the court to obtain jurisdiction over the obligor or his property and shall request . . . a hearing and give notice thereof to the obligor . . . ." § 42-779. The responding state court then holds a hearing and must reach a determination as to whether the obligor owes a duty of support; if it so finds, "it may order the obligor to furnish support or reimbursement therefor and subject the property of the obligor to the order." § 42-785. The same procedure may be used when the obligee and obligor are in different counties of the same state. 1 H. Clark, *supra*; § 42-794.

The second remedy, the procedure for which is outlined in the registration of foreign support orders sections contained in part

IV of the act, allows the beneficiary of an outstanding support judgment of another state to register that judgment in the state where the obligor is present and provides a summary procedure for enforcing that judgment in the obligor's state as if the registered judgment were one rendered by a court of that state. 1 H. Clark, *supra*; §§ 42-763(f) and 42-796 to 42-7,104. See *Wilson v. Ransom*, 233 Neb. 427, 446 N.W.2d 6 (1989).

## 2. Jurisdiction

While the court below correctly ruled it had jurisdiction over the subject matter of this action, such jurisdiction does not rest on the ground asserted by the father. He postulates that the court acquired jurisdiction because of the mother's registration of the South Dakota support judgment in her favor in Lancaster County pursuant to § 42-7,101, a component of part IV of the act. Although the mother's petition for registration in Lancaster County does not appear in the record, we assume for purposes of our analysis that such petition was, as the father claims, filed pursuant to RURESA.

Part IV relates to the registration of foreign support orders for the purpose of seeking enforcement in this state of money obligations accrued under a foreign support order. Thus, § 42-7,101 applies only when a party has already obtained a support order in another state and is merely seeking to enforce in this state the money obligations accrued under the foreign support order. See *Wilson v. Ransom, supra*. See, also, *Riedy v. Riedy*, 222 Neb. 310, 383 N.W.2d 742 (1986), in which we held that under a registration scheme contained in the Uniform Enforcement of Foreign Judgments Act, Neb. Rev. Stat. §§ 25-1587 through 25-15,104 (Reissue 1979), which is similar to that contained in part IV of RURESA, the courts of this state are empowered to enforce money obligations accrued under a foreign alimony decree but are not empowered to enforce or modify foreign alimony decrees with respect to unaccrued money obligations.

The father is also incorrect in characterizing this proceeding as an action to modify a prior support order. There is no prior support order requiring the mother to pay child support. Thus, the action is one to determine whether the mother owes a duty

to support the children now that they are in the father's physical custody. Accordingly, the proceeding is to be treated as an original action under part III of the act.

It is clear that the courts of Nebraska have jurisdiction to enter a support order under part III of RURESA even though no such order was entered in the state dissolving the marriage or in any other state. In the case of *State of Iowa ex rel. Petersen v. Miner*, 226 Neb. 551, 412 N.W.2d 832 (1987), the parties were divorced in Iowa. The decree awarded support for two of the parties' children and, although it mentioned a third child, made no provision for that child's support. Thereafter, the mother filed an action in Iowa seeking to enforce the support ordered in the decree for the two children against the father, who was alleged to be living in Douglas County, Nebraska. The Iowa court entered a judgment of support and forwarded the matter to the district court for Douglas County, Nebraska. Because the first child had attained the age of majority, the Douglas County District Court entered judgment only for arrearages in child support attributable to the second child. No appeal was taken from that order. The third child was not mentioned in either the reciprocal petition before the Douglas County District Court or that court's order. The mother then filed another action in the district court for Douglas County, alleging that through oversight the third child's name was omitted from the reciprocal petition and subsequent orders of the Iowa and Nebraska courts. The mother asked that the order of support be modified to include the third child and to order the father to pay support. The district court ordered modification, and the father appealed, urging that the district court lacked jurisdiction to find a duty of support for the third child, as it had not been established by the Iowa court which entered judgment on the reciprocal petition.

In answer to the father's claim, we stated:

Appellant asserts that URESA was enacted *only* for the purpose of enforcing foreign support orders "and not for modification, increase, or decrease of rights due to a prior decree." Brief for Appellant at 10. This position misstates case law as well as the language of the statutes. This court has previously held that "[u]nder [URESA] the court in

the responding state may fix the support payment at a different amount than that specified by the judgment in the initiating state." *Chisholm v. Chisholm*, 197 Neb. 828, 830, 251 N.W.2d 171, 173 (1977). In addition, the act itself provides that its purpose is "to improve and extend by reciprocal legislation the enforcement of *duties of support*." (Emphasis supplied.) § 42-762. These "duties of support" are not limited to duties previously imposed by a sister state. They include duties "imposable by law or by order, decree, or judgment of any court . . . ." § 42-763(b). Finally, "imposable by law" is defined as imposable by both common law and statutory law. § 42-763(e).

It seems clear from the face of the act that not only existing orders of support but also existing duties of support which have not been the subject of adjudication may be enforced under part III of URESA. §§ 42-768 et seq. Secondary authorities, as well as courts in other jurisdictions, are in accord with this proposition. One expert, Professor W.J. Brockelbank, has stated that it is a "misconception" that "only *orders* of support of one state will be enforced in another under the Act. In fact it is 'all duties,' and the duty, of course, may grow out of the order of support or a judgment or decree but is equally a duty if it never has received judicial attention and now is the basis of litigation for the first time under the Act." W. Brockelbank, Interstate Enforcement of Family Support 39 (F. Infausto 2d ed. 1971).

Many other jurisdictions have held, and we agree, that the "[p]rovisions of URESA make clear that its applicability is not dependent on the existence of other proceedings." *England v. England*, 337 N.W.2d 681, 683 (Minn. 1983). URESA has often been interpreted to require application of the act in cases in which a duty to support a child is "imposable" by either common law or statutory law. [Citations omitted.]

In a URESA proceeding, the initiating state need not determine whether a duty of support exists. Ordinarily, the duty of a parent to support his or her child is imposable by the responding state, even though no previous order of

support exists. [Citations omitted.]

Appellant is concerned that URESA is being used to *create* a duty of support rather than merely *enforcing* such duty. He is correct that URESA "itself creates no duties of family support but leaves this to the legislatures of the several states." Unif. Reciprocal Enforcement of Support Act, Prefatory Note, 9B U.L.A. 382 (rev. 1968). Appellant's obligation to support his minor children was not created by URESA. The common law and statutory laws of most states, including Nebraska and Iowa, provide that parents have an obligation to support their minor children. [Citations omitted.] In this case, URESA was used only to enforce appellant's legal obligation to contribute to the support of his children. The act did not independently create this obligation.

(Emphasis in original.) *State of Iowa ex rel. Petersen v. Miner* at 553-54, 412 N.W.2d at 833-34. See, also, *Glickman v. Mesigh*, 200 Colo. 320, 615 P.2d 23 (1980); *Ainbender v. Ainbender*, 344 A.2d 263 (Del. Super. 1975); *Hall v. Hall*, 585 S.W.2d 384 (Ky. 1979).

### 3. Mother's Child Support Duty

Having determined that the courts of this state possess jurisdiction to grant the relief the father seeks, we turn our attention to his claim that the court below abused its discretion by failing to order the mother to pay child support.

### (a) Choice of Law

Before proceeding further, however, we note that § 42-768 specifies that the duties of support enforced by RURESA are those imposed by the law of any state in which the obligor was present during the period for which support is sought and that the obligor is presumed to have been present in the responding state unless otherwise proved. Thus, the law of Nebraska is controlling in this case. See, *State of Iowa ex rel. Petersen v. Miner*, 226 Neb. 551, 412 N.W.2d 832 (1987); *Koon v. Boulder Cty., Dept. of Soc. Serv.*, 494 So. 2d 1126 (Fla. 1986); *Rosenberg vs. Rosenberg*, 152 Me. 161, 125 A.2d 863 (1956); *Ratcliffe v. Ratcliffe*, 709 S.W.2d 609 (Tenn. App. 1986); *Davidson v. Davidson*, 66 Wash. 2d 780, 405 P.2d 261 (1965).

### (b) Father's Conduct

We must next consider whether the court below was correct in finding that, in any event, the father was not entitled to relief because of his "unclean hands."

The mother argues that under *Voichoskie v. Voichoskie*, 215 Neb. 775, 340 N.W.2d 442 (1983), *appeal after remand* 219 Neb. 670, 365 N.W.2d 467 (1985), the father's failure to pay child support in the past bars him from now seeking support from her. In *Voichoskie,* the former husband sought to reduce the amount of support he had been previously ordered to pay. At the time he sought modification, he was in arrears on his child support payments. We determined that the doctrine of unclean hands could be invoked to bar the former husband's claim for relief only if the evidence showed that he was able to pay the arrearages but nevertheless failed to or was unable to pay through some intentional conduct on his part. *Voichoskie* is inapposite. In the present case, the father is not currently delinquent in child support payments; he paid the arrearage as required by the parties' settlement agreement. Moreover, it was not shown that the father's failure to pay alimony for the past year was intentional. Unlike the situation in *Voichoskie,* wherein the former husband sought a reduction in the amount of child support he was required to pay, the father here seeks child support from the mother not for his own benefit but for the benefit of the children. There is no question but that child support payments are to be used for the benefit of the child on whose behalf they are paid. *Gordon v. Gordon*, 231 Neb. 857, 438 N.W.2d 762 (1989). Thus, the important consideration is not whether the father is at fault but, instead, the needs and best interests of the children. See *Wagner v. Wagner*, 224 Neb. 155, 396 N.W.2d 282 (1986).

### (c) Scope of Review

Fixing the amount of child support is equitable in nature, and, thus, such determinations under RURESA are reviewable in the same manner as are orders fixing child support in dissolution of marriage proceedings. See *Reynolds v. Reynolds*, 86 Cal. App. 3d 732, 150 Cal. Rptr. 423 (1978). The decision whether to grant child support under RURESA is therefore one

within the discretion of the trial court, and, although reviewed de novo on the record, the trial court's decision will be upheld absent an abuse of discretion. See *Dabbs v. Dabbs*, 230 Neb. 368, 431 N.W.2d 640 (1988). In determining the amount of child support to be awarded under RURESA, the trial court must take into consideration the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children. See, *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988); *Hamm v. Hamm*, 228 Neb. 294, 422 N.W.2d 336 (1988).

### (d) Extent of Mother's Obligation

While not a bar to his ability to recover child support from the mother, the father's past failures to pay child support and alimony do affect the mother's current financial situation. The depletion of her cash dissolution settlement is the result of moneys she had to spend to support the children when the father was failing to make payments. Conversely, the father, although he has debts amounting to about $67,000, most of which relate to his practice, has "assets of $57,931" and accounts receivable of $8,000. Nor does the father testify that the children are in need of financial support from the mother. All he says is:

> I haven't been able to take the children places that I would like to and do things with them that I would like to strictly because of the lack of the finances.
>
> . . . .
>
> . . . I would like to go out for dinner a couple times a month, but anymore, that's just hamburgers or pizza.

It is clear that the father's potential earning capacity, based on his education and experience, is far greater than the mother's. She currently earns a gross income of approximately $16,000 each year, while he has earned in the past, and has the potential of earning in the future, more than twice that amount.

This court's child support guidelines, promulgated pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 1988), came into existence on October 1, 1987, *Hamm v. Hamm, supra,* and apply to any award made from and after that date. Those guidelines recommend that even in low income cases, minimum

support be set. Accordingly, we hold that the court below abused its discretion in not requiring the mother to pay support in the sum of $10 per month per child.

### 4. Attorney Fee

Left for resolution is the matter of the attorney fee the court below awarded the mother. The awarding of attorney fees expended for a hearing on a modification of a dissolution decree is a matter within the trial court's discretion. *Shada v. Shada*, 232 Neb. 805, 442 N.W.2d 386 (1989); *Ritchie v. Ritchie*, 226 Neb. 623, 413 N.W.2d 635 (1987); *Busekist v. Busekist*, 224 Neb. 510, 398 N.W.2d 722 (1987); *Meyers v. Meyers*, 222 Neb. 370, 383 N.W.2d 784 (1986). Factors to be considered in awarding such fee are the amount of alimony awarded, if any, the earning capacity of the parties, the services performed and results obtained, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. See *Ritchie v. Ritchie, supra*. We apply the same rules and considerations to RURESA actions concerning the fixing of child support.

This case presented unsettled questions of law, and there exists a significant disparity between the economic positions of the parties. Thus, we cannot say that the court below abused its discretion in awarding the mother a $500 attorney fee notwithstanding that her defense to the father's claim has proved not to be entirely successful.

### IV. DECISION

For the foregoing reasons we rule as stated in part I of this opinion. Neither party is entitled to an attorney fee in this court.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.

FAHRNBRUCH, J., not participating.